The CITY OF SEYMOUR, Indiana,
Defendant–Appellant,

v.

ONYX PAVING COMPANY, INC.,
Plaintiff–Appellee.

No. 36A01–8805–CV–147.

Court of Appeals of Indiana,
First District.

July 31, 1989.
Rehearing Denied Sept. 28, 1989.

Jeffrey J. Lorenzo, Seymour, for defendant-appellant.

Edward A. Pollen, Joseph M. Black, Jr., Rothering, Lambring & Black, Seymour, for plaintiff-appellee.

BAKER, Judge.

## STATEMENT OF THE CASE

Defendant-appellant, City of Seymour (Seymour), appeals both the granting of an injunction and an award of damages in favor of plaintiff-appellee, Onyx Paving Company (Onyx), in a consolidated action involving the construction of a bituminous asphalt batch plant.

We affirm in part, reverse in part, and remand with instructions.

## STATEMENT OF THE FACTS

During the last week of June or first week of July, 1985, Onyx, by counsel, met with Kathy Kinzel (Kinzel), Building Commissioner for the City of Seymour, to inquire as to the zoning classification of certain real estate, and to determine whether its use as a bituminous asphalt batch plant would be permitted. Counsel for Onyx informed Kinzel about the basic operation of an asphalt batch plant and explained that the manufactured product would be used for paving streets. Upon consulting the Seymour Zoning Code, Kinzel determined that the real estate in question was zoned I–2, Heavy Industrial. She agreed that the proposed batch plant would fall under the same provisions as a concrete mixing plant and was a permitted use within the I–2 classification. Satisfied that it could build an asphalt batch plant on the real estate in question, Onyx subsequently proceeded to purchase the property for $74,500 contin-

gent upon obtaining the permits required by the appropriate authorities, including zoning.

On July 19, 1985, counsel for Onyx telephoned Kinzel and informed her that representatives for Onyx would be in that day to file for an Improvement Location Permit to build the asphalt batch plant on the property. Later that same day, Greg Pardieck, a vice-president of Onyx, appeared at Kinzel's office to file for a permit. At that time he submitted to Kinzel a pre-application form, site plans, letter from the Indiana Department of Natural Resources approving the batch plant location, and the required fee. Pardieck informed Kinzel that Onyx wanted the permit for a bituminous asphalt batch plant and explained that when completed the plant would produce blacktop used for paving roads. He also informed Kinzel that the plant would require a 10 by 12 foot utility building and estimated that the cost of the entire project would be $100,000. Kinzel completed the application for the Improvement Location Permit, accepted the application fee, and signed and issued the Improvement Location Permit to Onyx. Verbatim, the permit stated that it was issued for:

"bituminous batch plant utility bldg. 10' × 12' ".

*Record* at 1125.

After receiving the permit Onyx completed purchasing the land in question, purchased for $60,000 a pre-existing asphalt batch plant, and acquired various other state permits and approvals. On September 4, 1985, Onyx sought and received an extension of time within which to begin construction of the plant, extending the date by which construction was required to begin to March 4, 1986. Onyx in fact commenced construction of the plant prior to that date. On March 10, 1986, however, Kinzel issued a stop work order at the site pursuant to direction of the mayor. Onyx complied with the order and stopped work immediately. On March 12 Kinzel, the mayor, and the city attorney requested Onyx to provide proof of exemption from the State Building Commission and to provide a better site plan. Onyx provided the city with a more detailed site plan and

proof of the exemption on March 13 and 14. Seymour then asserted the need for a Special Exception Permit on the possibility that the asphalt batch plant manufactured tar or tar products or was engaged in the process of oil processing, refining, and manufacturing. During negotiations Seymour officials informed Onyx that the matter had been investigated, that it would not cancel the stop work order, and that it would file suit against Onyx if it violated the order.

On March 24th, Onyx filed suit in the Jackson Circuit Court requesting injunctive relief and damages. On that same date, Onyx filed an appeal with the Seymour Board of Zoning Appeals. That appeal was subsequently denied after which Onyx filed a petition for writ of certiorari with the Jackson Circuit Court. That cause is currently pending with no action having been taken by either party. On the following day, March 25, Seymour also filed suit by separate action in the Jackson Circuit Court. On April 10, Onyx filed a motion to consolidate the separate causes, unopposed by Seymour, which the trial court granted. On April 14, Onyx filed with the city a notice of tort claim. Seymour, however, never placed a claim on the docket of the city council and took no action to honor or deny such. Thereafter, Seymour filed a motion to separate the issues for trial. The trial court granted that motion and set the parties' claims for injunctive relief for trial on June 9 and 10.

Following the trial on the injunction issues, the trial court entered its Findings of Fact and Conclusions of Law. It entered judgment in favor of Onyx, granting its request for an injunction and denying the city's request for injunctive relief. Trial on the damages issues was subsequently set for and tried on November 4, 5, and 6, 1987. The trial resulted in a jury verdict in favor of Onyx in the sum of $121,600. Seymour subsequently instituted this appeal.

## ISSUES

Due to our resolution of this case, this appeal presents the following issues for our review:

I. Whether the trial court had jurisdiction to hear the suit for injunction.

II. Whether some of the trial court's findings of fact were clearly erroneous.

III. Whether Seymour is immune from liability for the issuance of the stop work order under IND.CODE 34-4-16.5-3.

IV. Whether the trial court erroneously permitted the jury to consider improper evidence of damages.

Additionally, Onyx contends the trial court erred in refusing to permit it to offer proof of the attorney fees it incurred in either or both the injunctive relief or damage portion of the cause.

## DISCUSSION AND DECISION

### ISSUE I: *Jurisdiction*

■ Seymour contends that the trial court did not have jurisdiction to hear the injunction suit because Onyx failed to exhaust its administrative remedies. Seymour argues that Onyx was required to appeal the issuance of the stop work order to the board of zoning appeals pursuant to Seymour Zoning Code Section 1.08(B)(4). Then, upon receiving an unfavorable decision, it could file a petition for certiorari to review the decision with the Jackson Circuit Court. *See* IND.CODE 36-7-4-1003. Seymour claims that because Onyx did not exhaust this administrative procedure, the trial court was precluded from exerting jurisdiction over the suit for injunctive relief.

Seymour Zoning Code Section 1.08(B)(4) states as follows:

Any decision of the building commissioner in enforcement of this ordinance may be appealed to the Board [of Zoning Appeals] by any person claiming to be adversely affected by such decision.

*Record* at 1494.

Initially, we observe that the language contained in this section of the zoning ordinance is discretionary, not mandatory. This section states that a person adversely affected by a decision of the building commissioner "may" appeal such to the board

of zoning appeals. Thus, there is no requirement within the Seymour Zoning Ordinance mandating Onyx to appeal to the board of zoning appeals the issuance of the stop work order by the building commissioner. In fact, Seymour Zoning Code Section 12.01(A) entitled "Enforcement and Penalties" permits the institution of a suit for injunction in the Jackson Circuit Court by any person adversely affected by a decision of the building commissioner. Seymour Zoning Code Section 12.01 states:

The commission, the board, building commissioner, or any designated enforcement official, or any person or persons, firm or corporation jointly or severally agreed, may institute a suit for injunction in the Circuit Court of Jackson County to restrain any individual or a governmental unit from violating the provisions of this code.

*Record* at 1607. Under the Seymour Zoning Code Onyx was permitted to directly challenge a decision of the building commissioner through injunctive relief proceedings without first obtaining an unfavorable ruling from the board of zoning appeals. Thus, the Jackson Circuit Court had jurisdiction to hear the suit for injunctive relief filed by Onyx.

### ISSUE II: *Erroneous Findings*

Seymour next contends that the trial court erred in entering various findings of fact and conclusions of law in support of its judgment. We remind Seymour of our standard of review. It is a well established and acknowledged rule that when we review a case in which a trial court has rendered findings of fact and conclusions of law, we will not set aside the trial court's judgment unless it is clearly erroneous. *Rose Acre Farms, Inc. v. Greemann Real Estate* (1987), Ind.App., 516 N.E.2d 1095; Ind. Rules of Procedure, Trial Rule 52. The findings or judgment of the trial court will be found to be clearly erroneous only when on the entire record the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Skweres v. Diamond Craft Co.* (1987), Ind.App., 512 N.E.2d 217. Furthermore, we will neither reweigh the evidence

nor reassess the credibility of the witnesses, but will consider only the evidence in the record which supports the judgment along with the reasonable inferences which may be drawn therefrom. *Id.*

■ Seymour contends that Onyx did not possess a permit for construction of a bituminous asphalt batch plant. Instead, it claims that Onyx only possessed a permit for a 10 by 12 foot utility building for use with a bituminous asphalt batch plant. Seymour claims that the site plan submitted by Onyx on March 14, 1986, shows six different structures and that had Kinzel been presented with the site plan earlier, she would have issued six separate Improvement Location Permits for construction of those buildings. Thus, it claims the trial court erred in concluding that the Improvement Location Permit issued was for the entire six buildings.

In its conclusions of law, the trial court determined that Onyx possessed an Improvement Location Permit for a utility building and a bituminous batch plant. We are not persuaded that the trial court's finding in this regard was erroneous. The record reveals, without dispute, that Onyx applied for and obtained on June 19, 1985, pursuant to the requirements of the Seymour Zoning Code an Improvement Location Permit for improvements it planned to construct on the land in question. The record discloses that when inquiring as to the zoning classification of the property, counsel for Onyx informed Kinzel that Onyx intended to use the property for a bituminous asphalt batch plant, and further informed her as to the basic operation of such. A vice-president for Onyx similarly instructed Kinzel on the date Onyx applied for and obtained the permit. Kinzel testified that she agreed that use of the property as an asphalt batch plant would be permitted within the I–2 Heavy Industrial zoning classification just as concrete mixing was and issued to Onyx an Improvement Location Permit as set forth above. The estimated cost of such was $100,000. Subsequently, Onyx requested and received from Kinzel an extension of time within which to begin construction of the bituminous asphalt batch plant. It was not until approximately eight months later, in early March, and after conversations with the Seymour City Attorney wherein he asserted that construction of a bituminous asphalt batch plant was prohibited by the Seymour Zoning Code, that Kinzel began alleging that the Improvement Location Permit she had issued was for a utility building only. In light of the evidence before it, it was certainly reasonable for the trial court to conclude that the Improvement Location Permit was issued for a bituminous asphalt batch plant and not for a utility building exclusively. Seymour's contentions to the contrary present to us nothing more than an invitation to reweigh the evidence and rejudge the credibility of the witnesses. Our standard of review precludes us from doing so. The trial court's findings in this regard were not clearly erroneous.

■ In the alternative, Seymour maintains that Onyx was required to obtain a special exception permit in order to construct a bituminous asphalt batch plant on the property. Seymour argues that the phrase "bituminous batch plant" does not appear within the Seymour Zoning Code. An analysis of the term "bituminous" leads it to conclude that the intended use of the plant falls under either the category of oil processing, or tar and tar products, uses permitted by special exception only under the zoning code. *See* Seymour Zoning Code, § 3.02(A)(8)(a)(2) and (6). In support of its contentions, Seymour cites us to several definitions of the words "tar", "bituminous", and "asphalt". It points out that each definition contains the word "bituminous". It asserts that giving these words their ordinary meaning as commonly understood through their definitions would lead one to reasonably conclude that use of the plant would fall within either of the categories set forth above. Thus, the trial court erred in concluding that construction of the bituminous asphalt batch plant did not fall within the scope of the special exceptions section of the I–2 Heavy Industrial zoning classification.

Once more Seymour merely invites us to reweigh the evidence and rejudge the credibility of the witnesses. As Seymour concedes, use of the property for an asphalt batch plant was not specifically addressed within the zoning code. The evidence before the trial court, however, demonstrated that the plant mixed asphaltic cement and aggragate to produce asphaltic concrete or pavement. The product was manufactured pursuant to the State of Indiana Highway Specifications. Similarly, the Seymour Zoning Code refers in numerous instances to asphaltic pavement and requires that such meet State of Indiana Highway Specifications. Several experts familiar with these specifications testified that such do not permit the use of tar in asphaltic pavement. Extensive expert testimony revealed that asphaltic pavement is a petroleum product and does not contain tar. Further, John Staley, one of the individuals hired by Seymour to prepare the zoning code, testified that the drafters modeled the Seymour Zoning Code after the Indianapolis Marion County Code. He stated that the provisions in the model code referring to bituminous batch plant as a use permitted by special exception was deleted by Seymour when adopting its code. He testified further that the drafters intended asphalt batch plants to be treated just as concrete mixing plants, a use permitted without the need of application for a special exception permit. Finally, testimony showed that Seymour had never issued a special exception permit to any person or entity for any reason including a competing asphalt batch plant operating its plant within the Seymour I-1 Light Industrial area. In light of this evidence, we must conclude that the trial court's finding of fact and judgment were not clearly erroneous.

ISSUE III: *Immunity*

Notwithstanding that Onyx possessed a valid permit to construct a bituminous batch plant on the land in question, Seymour asserts that under IND.CODE 34-4-16.5-3 it is immune from any liability Onyx incurred by virtue of its issuance of the stop work order. That statute provides in pertinent part:

A governmental entity or an employee acting within the scope of his employment is not liable if a loss results from:

(6) The performance of a discretionary function:

(7) The adoption and enforcement of or failure to adopt or enforce a law, including rules and regulations, unless the act of enforcement constitutes false arrest or false imprisonment;

\* \* \* \* \* \*

(10) The issuance, denial, suspension, or revocation of, or failure or refusal to issue, deny, suspend, or revoke, any permit, license, certificate, approval, order, or similar authorization, where the authorization is discretionary under the law;

(11) Failure to make an inspection, or making an inadequate or negligent inspection, of any property, other than the property of a governmental entity, to determine whether the property complied with or violates any law or contains a hazard to health or safety.

Seymour argues that its conduct fell within at least one of these statutorily immune categories.

Seymour principally relies upon the immunity extended for discretionary acts set forth under subsection 6 above. Traditionally, we have distinguished between ministerial and discretionary acts to determine if certain conduct is included within the above immunity provision. A ministerial act is one which a person performs in a given state of facts in a prescribed manner, in obedience to the mandate of legal authority without regard to, or the exercise of, his own judgment on the propriety of the act being done. *City of Hammond v. Cataldi* (1983), Ind.App., 449 N.E.2d 1184. Conversely a duty is discretionary when it involves on the part of the employee the determination whether or not he should perform a certain act, and if so, in what particular way. *Adams v. Schneider* (1919), 71 Ind.App. 249, 124 N.E. 718. Recently, however, in *Peavler v. Monroe County Board of Commissioners* (1989), Ind., 528 N.E.2d 40, our supreme court

expressly abandoned the ministerial/discretionary test on the ground that such standard failed to establish clear parameters between protected and unprotected governmental acts. In its stead, the supreme court adopted the planning/operational test as a means of determining whether particular conduct was entitled to discretionary act based immunity under subsection 6.

■ In its analysis, the supreme court stressed that the determination of whether a governmental action is immune as a discretionary function must be based on the purposes and policy underlying governmental immunity. It pointed out that the policy underlying governmental immunity is the fundamental idea that certain kinds of executive branch decisions should not be subject to judicial review. The supreme court explained that the type of conduct immunized from tort liability was that attributable to governing, the essence of which involved policy making activities. Thus, an appropriate analysis now requires an inquiry into the nature of the governmental act and the decision making process involved. It is not enough to merely inquire as to whether judgment was exercised, but rather one must inquire as to whether the judgment calls for policy considerations. The governmental entity seeking to establish immunity bears the burden of proving that the challenged act or omission was a policy decision made by consciously balancing risks and benefits. *Peavler, supra,* at 45–46.

In deciding whether the function is of the type intended to benefit from immunity, the court should look to the purposes of immunity to determine whether those purposes would be furthered by extending immunity to the acts in question. The supreme court listed the following factors which would point to immunity:

(1) The nature of the conduct.

(a) whether the conduct has a regulatory objective;

(b) whether the conduct involved the balancing of factors without reliance on a readily ascertainable rule or standard;

(c) whether the conduct requires a judgment based on policy decisions;

(d) whether the decision involved adopting general principles or only applying them;

(e) whether the conduct involved establishment of plans, specifications and schedule; and

(f) whether the decision involved assessing priorities, weighing of budgetary considerations or allocation of resources.

(2) The effect on governmental operations:

(a) whether the decision affects the feasibility or practicability of a government program; and

(b) whether liability will affect the effective administration of the function in question.

(3) The capacity of the court to evaluate the propriety of the government's action.

Whether tort standards offer an insufficient evaluation of the plaintiff's claim.

■ Applying the planning/operational test to the circumstances of the case at bar, we conclude that Seymour's conduct in issuing the stop work order is an act afforded immunity under subsection 6. The issuance of the stop work order was an attempt to enforce the Seymour Zoning Code and as such, had as its goal a regulatory objective. The decision whether to issue the stop work order was a judgment based upon policy decisions as enunciated and enacted in the zoning code. The decision also involved the balancing of several factors without the opportunity to rely on a readily ascertainable rule or standard. The zoning code did not provide a mechanism to stop work in order to more fully investigate whether a project was in compliance with its provisions, a course which Seymour believed essential in this case. Moreover, the imposition of liability would certainly affect the building commissioner's ability to effectively enforce the zoning code. Finally, traditional tort standards of reasonableness do not provide an adequate basis for evaluating the act challenged

here. The decision whether to enforce the zoning code was made in furtherance of a basic planning and policy making function; determining the acceptable uses of land within a city's jurisdiction in order to effectuate and promote its desirable growth and development. That decision is one generally committed to the legislative branch of government and cannot be evaluated under traditional negligence standards. Considering the nature of the conduct, the effect on governmental operations, and the capacity of the courts to evaluate the propriety of the government's actions, we conclude that the issuance of the stop work order was a discretionary act afforded immunity under IND.CODE 34-4-16.5-3(6).

 Additionally, we are of the opinion that Seymour is entitled to the benefit of immunity under subsection 7. That section extends immunity for losses resulting from the adoption and enforcement of a law, including rules and regulations. *Department of Natural Resources v. Morgan* (1982), Ind., 432 N.E.2d 59; *Cain v. Board of Commissioners of Cass Co.* (1986), Ind.App., 491 N.E.2d 544; *Board of Commissioners of Hendricks Co. v. King* (1985), Ind.App., 481 N.E.2d 1327; *Seymour National Bank v. State* (1981), Ind. App., 422 N.E.2d 1223. It cannot be disputed that the zoning ordinance at issue here is a part of the municipal code of Seymour. It was adopted in accordance with IND.CODE 36-7-4-101 to 36-7-4-1213, the act delegating to local legislative bodies the authority to enact zoning ordinances and amendments thereto. Section 1.08(A) of the zoning code charges the building commissioner with the duty to enforce the code. It is uncontradicted that Kinzel issued the stop work order for the purposes of enforcing the zoning ordinance. Thus, Seymour is protected from suit under clause 7. Onyx argues, however, that the act of enforcement required under clause 7 is only implicated in instances involving the enforcement of the criminal code by police officers. We are aware of no such limitation. By its express language, the immunity available under this clause extends generally to the enforcement of rules and regulations. There is no

specific designation that enforcement must be in furtherance of the criminal code. In fact, in *King, supra,* we stated in dicta that the immunity afforded under subsection 7 was applicable to a sanitation officer's attempt to enforce a local sewage disposal ordinance.

Onyx would also have us focus on IND. CODE 36-7-4-1013 setting forth the enforcement mechanism available for pursuing alleged violations of a zoning ordinance. It points out that issuance of a stop work order is not an authorized remedy thereunder. Onyx's reliance upon this statute is misplaced, however. It fails to recognize that immunity presupposes liability. Even if the damages incurred here resulted from Kinzel's negligent course of conduct in enforcing the ordinance, Seymour would nevertheless be immune from liability under the express terms of subsection 7. Finally, Onyx attempts to raise the allegation that Kinzel's conduct was willful and wanton so as to remove her from the immunity extended under subsection 7. We note, however, that this court struck down the willful and wanton argument in *Jacobs v. City of Columbus* (1983), Ind.App., 454 N.E.2d 1253.

 Subsections 10 and 11 are also applicable here. As discussed earlier, issuance of the stop work order is a discretionary act entitled to immunity under the Tort Claims Act. Subsection 10 also grants to a municipality immunity for its conduct in suspending or revoking a permit based upon the notion that those acts are discretionary. In reality, Kinzel's act in issuing the stop work order had the effect of revoking or suspending the original Improvement Location Permit. Its conduct in that regard was therefore immune under clause 10. Similarly, under clause 11 Seymour would be immune from liability for Kinzel's alleged negligent inspection and subsequent determination that the bituminous batch plant was not in compliance with the Seymour Zoning Ordinance.

ISSUE IV: *Damages*

Seymour also contends that the trial court erroneously permitted the jury to

consider improper evidence of damages. Inasmuch as we have determined that Seymour was immune from liability under the Indiana Tort Claims Statute, the jury's award of damages in the sum of $121,600 in Onyx's behalf must be reversed.

ISSUE V: *Attorney Fees*

■ Finally, Onyx complains that the trial court erred in refusing to permit it to offer proof as to the attorney fees it incurred in either the injunctive relief or damages portion of the case. Onyx's offer to prove was based upon alleged obdurate conduct on the city's behalf in pursuing this litigation. The obdurate behavior exception is designed to reimburse the prevailing party who has been dragged into baseless litigation. *Baker v. Townsend* (1988), Ind.App., 519 N.E.2d 192. It deals with conduct which is vexatious and oppresive in the extreme. A review of the record reveals, however, that such is not the case here. We perceive that Seymour's issuance of the stop work order and subsequent attempt to gain injunctive relief was in pursuit of a legitimate concern and purpose. Onyx was not entitled to attorney fees on this basis and the trial court did not err in excluding evidence of such at trial.

Accordingly, this cause is affirmed in part, reversed in part, and remanded with instructions to the trial court for proceedings not inconsistent with this opinion.

Judgment affirmed in part, reversed in part, and remanded with instructions.

RATLIFF, C.J., concurs.

CHEZEM, J., concurs in result.