**INDIANA DEPARTMENT OF CORRECTION, Keith Butts and John Nunn, Appellants,**

v.

**R. Paulette STAGG, Appellee.**

**No. 67A04–8905–CV–206.**

Court of Appeals of Indiana, Fourth District.

July 18, 1990.

Rehearing Denied Aug. 31, 1990.

Linley E. Pearson, Atty. Gen., Michael A. Schoening, Deputy Atty. Gen., Office of Attorney General, Indianapolis, for appellants.

Jessie A. Cook, Trueblood Harmon Carter & Cook, Terre Haute, for appellee.

MILLER, Presiding Judge.

Plaintiff-appellee Paulette Stagg, an attorney, represented a prisoner at the State Farm. After her representation was ended, she received from the prisoner a copy of a Department of Correction memorandum regarding her prison visitations which stated she was alleged to be romantically involved with the prisoner. The letter was opened by her law partner. Stagg sued defendants-appellants Indiana Department of Correction and its employees Keith Butts and John Nunn in a small claims action alleging the memorandum was defamatory and caused her embarrassment and humiliation. She sought damages in the amount of $3,000. At the conclusion of the trial, the court awarded Stagg $1,000 in damages and $560.12 in costs. The defendants' appeal raises two issues. One issue is dispositive—whether the court erred by failing to find the defendants immune under the Indiana Tort Claims Act because they were government employees acting within the scope of their employment and there was no evidence they were acting in bad faith.

We reverse.

## FACTS

At the time of trial, Stagg was a partner with the law firm Leedy & Stagg in Terre Haute, Indiana, and on occasion Stagg served as a criminal defense attorney on a court-appointed basis. She has never been subject to disciplinary action or complaint.

In 1986, she was appointed to represent Byron Alston, a prisoner at the Indiana State Farm in Putnamville, who had been charged with battery and rioting arising from an incident which occurred at the Farm. Stagg met with Alston in January, February and March, 1986 in order to prepare his defense. On each of these occasions, the meetings occurred at the maximum security unit of the Indiana State Farm. Stagg complied with all Department of Correction regulations and submitted to searches of her person and briefcase. Alston entered a plea of guilty in April, 1986.

On June 5, 1986, Stagg received a letter from Alston who had since been transferred to the Indiana Reformatory. This letter included a memorandum which had been placed in Alston's prison file prepared by officials of the Indiana Reformatory. The memorandum read as follows:

> Information has been received from the Investigator at the Indiana State Farm that the *subject has employed a female attorney by the last name of Stagg, who is alleged to be romantically involved with the offender.* If Ms. Staff visits the subject on a client/attorney basis, they should be observed closely and all offender/attorney procedures followed. Due to the offender being housed in G Cellhouse at the present, there will be no regular visiting passes issued for him, but in the event he is transferred to another housing location where visiting is authorized, it should be noted on the Visiting Card that Ms. Stagg can only visit as either an attorney or friend, not both.

(R. 317). (emphasis added).

The memorandum was signed by defendant John Nunn, Assistant Superintendent/Operations of the Indiana Reformatory. It included on its face a distribution list limited to Major Scrogham, the Information Desk, the Control Room, Visiting Room Officer, the offender's packet, and John Nunn's file.

The memorandum was a result of an investigation initiated by defendant, Keith Butts, Institutional Investigator at the Indiana State Farm, in response to information he received from an employee whose identity he could not recall. Before a complete investigation could be conducted, Alston was transferred from the Indiana State Farm to the Indiana Reformatory. As part of his routine duties, Butts telephoned the Indiana Reformatory and

informed officials that an investigation had begun with regard to Alston. As a result of Butt's phone call, the memorandum described above was prepared.

After Stagg received the copy of Nunn's memorandum and due to her knowledge of its publication, she declined further appointments to represent criminal defendants incarcerated at the Indiana State Farm. She testified that she was concerned about her ability to function as an advocate for prospective clients, and she believed she would be unable to obtain the respect and cooperation of Indiana Department of Correction employees necessary to fulfill such obligations. Stagg specifically relayed her concerns to a local judge after the judge requested that she accept an appointment to represent another State Farm inmate on an escape charge.

Stagg claimed damages of $3,000 due to her inability to accept future court appointments from Putnam County on behalf of prisoners housed at the Indiana State Farm. She also claimed she suffered embarrassment and humiliation and fear of potential disciplinary action. In bringing her claim to trial, Stagg incurred costs totaling $560.12 including her filing fee and payment for three depositions. Other facts pertinent to the decision will be added as necessary.

## DECISION

■ The trial court made specific findings of fact and conclusions of law which can only be set aside if they are clearly erroneous. A judgment is clearly erroneous if a review of the record leaves one with the firm conviction that a mistake has been made. *Porter County Board of Zoning Appeals v. Bolde* (1988), Ind.App., 530 N.E.2d 1212. The trial court's decision can only be reversed where the evidence is without conflict and points unerringly to a different conclusion. *Public Service Company of Indiana, Inc. v. Gibbs* (1984), Ind. App., 460 N.E.2d 992.

■ Defendants Department of Correction, Butts and Nunn contend the trial court erred in awarding judgment to Stagg because the defendants were protected by the Indiana Tort Claims Act (ITCA), IND. CODE § 34–4–16–.5–1 *et. seq.* Specifically, defendants contend they are immune by operation of I.C. § 34–4–16.5–3(7) which provides:

> A governmental entity or an employee acting within the scope of his employment is not liable if a loss results from:
>
> (7) the adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment; . . .

The Court erred in addressing this issue in that it adopted Stagg's proposed conclusion of law no. 8 which states:

> That the Defendants are entitled to no immunity under the Indiana Tort Claims Act due to their lack of good faith in making the statement at issue herein and their reckless disregard for the veracity of same. *The Court declines to address the issue of whether Defendants Butts and Nunn are law enforcement officers entitled to the protections of I.C. 34–4–16.5–3 but notes that no investigation of any kind was conducted by them and the Court finds that their conduct was carried out without either good faith or a reasonable belief or grounds for belief in the truth of the statement as it appeared in Defendant Nunn's April 1, 1986 memorandum.*

(R. 156). (Emphasis added).

We disagree with the trial court's conclusion that the defendants were not entitled to the immunity of the Tort Claims Act because the immunity is provided to *any* governmental entity or employee acting within the scope of his employment—not just law enforcement officers. Additionally, there is no requirement of a showing of good faith in order to qualify for the immunity.

First, I.C. § 34–4–16.5–3(7) does not restrict the provision to "law enforcement officers". On its face the immunity is provided to any "governmental entity" or "employee acting within the scope of his employment." This section is not limited to instances involving enforcement of the

criminal code by police officers. *City of Seymour v. Onyx Paving Co., Inc.* (1989), Ind.App., 541 N.E.2d 951 (applied to municipality that issued a stop work order for purposes of enforcing the zoning ordinance); *Board of Commissioners of Hendricks County v. King* (1985), Ind.App., 481 N.E.2d 1327 (applied to sanitation officer's attempt to enforce a local sewage disposal ordinance). Butts and Nunn are governmental employees. Butts was an Institutional Investigator at the Indiana State Farm and Nunn was Assistant Superintendent/Operations of the Indiana Reformatory. The Indiana State Farm and the Indiana Reformatory are governmental entities as defined by I.C. § 34–4–16.5–2(c) as they are institutions maintained and operated by the Indiana Department of Correction.[1]

Both Butts and Nunn were acting within the scope of their employment. Butts testified it was his job to investigate allegations made in reference to offenders, staff or visitors. He initiated an investigation of Stagg and Alston based on allegations he received from a staff member whose identity he could not recall. Based on that information, Butts observed portions of one of Stagg's visits with Alston. He testified that it was his "gut" feeling that Alston, who was a known troublemaker, was up to something because he appeared to be happy and high-spirited. Butts was unable to complete his investigation because Alston was transferred to the Indiana Reformatory within a few days of his receiving the tip—providing Butts only one opportunity to observe Alston and Stagg. Butts further testified it was a routine and normal part of his duties to telephone the institution where an offender is transferred to inform officials at the new institution that an investigation had been initiated.

Edward Cohn, Superintendent of the Indiana Reformatory testified he received a telephone call from Butts to the effect that Alston's attorney had a relationship with, or feelings toward him other than those of an attorney. Cohn testified that Butts's allegation to him was factual in nature, that he expected that the information would not have been conveyed to him unless it has been the result of some sort of an investigation; however, he had not inquired of Butts whether he had in fact conducted such an investigation and had a basis for his communication. Cohn relayed the information to defendant Nunn because action on the information fell within Nunn's duties as assistant superintendent of the institution. Nunn then prepared the allegedly defamatory memorandum without further investigation of the facts. Nunn testified that it was his expectation that the information conveyed to him was of a factual nature and the result of an investigation wherein someone had determined there had been some misconduct. Nunn further testified that he "assumed" that the information was based on more than a "gut feeling," but that he did not inquire further. (R. 307–308).[2]

█ The defendants were acting within the scope of their employment in enforcing laws, rules or regulations pertaining to the standards and procedures for the operation of the correctional facilities pursuant to I.C. § 11–11–1–4 *et seq.* It is uncontested that the Indiana Department of Correction is specifically empowered to place restrictions on visitation to maintain security, promote safety and retain manageability of correctional institutions. Even attorney-client visitations are subject to restrictions in order to maintain security.[3]

█ Stagg contends defendants' conduct in this case was a deliberate misrepresentation of facts by Butts and that Nunn then memorialized the misrepresentation without any effort to determine the accura-

---

1. *See Sheets v. Indiana Department of Corrections* (S.D.Ind.1986), 656 F.Supp. 733, where the court held the Indiana Tort Claim Act applies to Department of Correction and its employees.

2. The above testimony of Butts, Cohn, and Nunn was tracked in the court's findings of fact. The State did not challenge the court's findings.

These are the facts upon which the court based its Conclusions of Law No. 8 that the defendants did not act in good faith and had a reckless disregard for the truth of the matter.

3. I.C. § 11–11–3–8 and 11–11–3–9.

cy of Butts' statements. Under I.C. § 34-4-16.5-3(13) a governmental entity or an employee acting within the scope of his employment is not liable if a loss results from "misrepresentation if unintentional". Stagg contends the defendants intentionally misrepresented the facts about her and are not entitled to immunity. However, we can find nothing in the record or the findings to indicate the statements or actions by any of the defendants amounted to an "intentional" misrepresentation. The memo merely states that Stagg is *"alleged* to be romantically involved with the offender." (emphasis added). There is no allegation that Ms. Stagg acted improperly or unprofessionally, or that she was in fact romantically involved. Perhaps there was a poor choice of wording in the memo, but clearly an allegation had been made that Alston might be attempting to misuse the attorney-client visitations. An investigation was initiated, but not completed. In an effort to alert the Indiana Reformatory to a potential problem, Butts contacted the officials at the Reformatory. The Supreme Court has recognized that courts should give "deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement." *Jones v. North Carolina Prisoners' Labor Union, Inc.* (1977), 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629.[4] "[T]he realities of running a penal institution are complex and difficult ..." *Id.* at 126, 97 S.Ct. at 2538. Numerous associational rights may be curtailed whenever the institution's officials

reasonably conclude such associations possess the potential to disrupt prison order or stability. *Id.* at 132, 97 S.Ct. at 2541. Under the circumstances, we agree with the defendants that the acts were related to the operation and the security of correctional facilities and we find that the facts surrounding the preparation and limited distribution of the memorandum did not support the judgment entered by the court.[5]

Immunity assumes negligence but denies liability. *Peavler v. Board of Commissioners of Monroe County* (1988), Ind., 528 N.E.2d 40. The purpose of immunity is to insure that public employees can exercise their independent judgment necessary to carry out their duties without threat of harassment by litigation or threats of litigation over decisions made within the scope of their employment. *Foster v. Pearcy* (1979), 270 Ind. 533, 387 N.E.2d 446, *cert. denied*, 445 U.S. 960, 100 S.Ct. 1646, 64 L.Ed.2d 235 (1980); *Indiana State Police Dept. v. Swaggerty* (1987), Ind.App., 507 N.E.2d 649. "If immunity exists, the public body and the employees simply are not liable." *State, Dept. of Natural Resources v. Taylor* (1981), Ind. App., 419 N.E.2d 819, 823. The degree of "culpability, and the nature of its tortious conduct, are not relevant considerations." *Id.*

In *Seymour National Bank v. State* (1981), Ind., 428 N.E.2d 203, 204, our supreme court stated that immunity may be lost if the acts of public employees are

---

4. In *Jones, supra,* the prisoners' labor union brought an action against the North Carolina Department of Correction because the prison officials had prohibited the union from soliciting membership, barred union meetings, and refused to deliver union publications mailed to inmates. The District Court granted injunctive relief. The Supreme Court reversed, observing that prison life contains the potential for violent confrontation. "Responsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of the riot." *Id.* 132–133, 97 S.Ct. at 2541–2542.

5. The memorandum was published in a limited fashion to a closed set of people. Specifically, Nunn had copies:

(1) placed in his file;
(2) forwarded to Major Scrogham, Chief Custody Officer at the Indiana Reformatory;
(3) forwarded to the information desk;
(4) forwarded to the control room, through which all visitors pass in order to engage in visitation;
(5) forwarded to the visiting room officer who supervises and observes all visitations; and
(6) placed in Alston's packet.

Stagg introduced evidence that only three other people had seen the memorandum: Alston, who sent it to Stagg, her partner who opened the letter from Alston, and herself.

so "outrageous as to be incompatible with the performance of the duty undertaken". However, in *Jacobs v. City of Columbus* (1983), Ind.App., 454 N.E.2d 1253, this court observed that this language of *Seymour* was dicta. *Id.* at 1260.[6] *Jacobs*, like the present case, involved defamation. The Indiana State Police Department began an investigation of Jacobs, a surgeon at Bartholomew County Hospital, who was a suspect in the poisoning of anesthesiologist, Dr. Griffith Marr. In the course of their investigation, the police officers heard "gossip and rumor of affairs, triangles," and professional jealousies. *Id.* at 1255. These rumors included charges that Jacobs had homosexual tendencies and that Jacobs was " 'A/C–D/C' which in street argot refers to being both homosexual and heterosexual." *Id.* at 1256. The officers repeated these rumors during interviews with various people (hospital staff members, former patients and acquaintances of Dr. Jacobs, and other law enforcement officers) during the course of their investigation. Jacobs sued for defamation. The officers admitted making the statements. The State Police raised I.C. § 34–4–16.5–3(7) as a defense. This court found the State and the officers immune because there was no evidence suggesting the officers went "beyond their general investigative authority or were motivated by anything that could be termed 'frolic and detour' or personal interest." *Id.* at 1261. Likewise, we find nothing in the present record to indicate any of the defendants acted outside the scope of their authority or that any of their actions were motivated by personal animosity toward Stagg. Butts had a duty to make a report to the receiving institution—whether it was a rumor or not. Nunn took action based on the information received from Butts. There was no evidence of the defendants' bad faith. Although the matter was poorly handled, we do not find the defendants' conduct rises to the level of "outrageous conduct," nor do we find they acted outside the scope of their employment.

Therefore, we find the trial court erred in failing to find the defendants immune under the Indiana Tort Claims Act. This matter is remanded to the trial court with instructions to enter judgment for defendants.

CONOVER, J. concurs.

STATON, J. dissents with opinion.

STATON, Judge, dissenting.

Bad faith looms large when nourished with evidence of inability to identify the source of information and with evidence of complete lack of follow-up on the part of a professional investigator. Defaming a lawyer and intruding into the client-attorney relationship upon nothing more than a "gut feeling" is bad faith. Too, a trained, professional investigator who circulates a memorandum defaming an attorney and destroying the attorney's reputation upon a "gut feeling" so flimsy as an unidentified, unchecked, and unverifiable source is acting outside the scope of his employment. This irresponsible action on the part of the professional investigator goes to the heart of effective representation of a client by his attorney. This kind of interference with effective representation should not be tolerated; therefore, I dissent.

Why is bad faith so evident? First, because the "romantic involvement" is based upon a single observation. Secondly, the observation by the professional investigator reveals absolutely nothing to indicate a "romantic involvement." As the Majority points out, the observation revealed that Alston appeared to be happy and high-spirited while talking to his attorney. If every time an attorney visits his client in prison and the client appears happy and high-spirited, a "romantic involvement" memorandum or some other derogatory memorandum goes into the file; then, it appears to me that there is a clear attempt to interfere with the attorney-client relationship and the effective assistance of counsel. This is bad faith on the part of the professional

---

**6.** If the governmental entity is immune under subsection 7, even willful or wanton behavior does not remove the immunity. *Riggin v. Board*

*of Trustees of Ball State University* (1986), Ind. App., 489 N.E.2d 616, 631; *City of Seymour v. Onyx Paving Co., supra,* 541 N.E.2d at 958.

investigator and places his action outside the scope of his employment.

Why is the professional investigator's circulation of the "romantically involved" memorandum outside the scope of his employment? First, because the memorandum was circulated without any investigation. It was circulated on a "gut feeling" instead. A professional investigator is paid by the State to investigate. He is employed to unearth facts which expose matters of importance to his employer. He is not employed to write memoranda on his "gut feelings" absent any relevant facts. Secondly, the professional investigator's superior, Edward Cohn, Superintendent of the Indiana Reformatory, testified that he assumed that the professional investigator's Memorandum was *factual in nature* and that the Memorandum would not have been conveyed to him unless there had been *some sort of investigation.* The Memorandum was neither *factual in nature or the result of some sort of investigation.* To have been acting within the scope of his employment, there had to be both.

The immunity shield afforded by I.C. 34–4–16.5–3(7) protects an employee of the State only when he is enforcing rules and regulations while acting in the scope of his employment. If he is acting outside his scope of employment, the immunity shield disappears, and the employee must stand as any other citizen. He must answer to those harmed by his irresponsible acts. No one would contend that the immunity shield would protect a State employee whose conduct was outrageous or willful and wanton. Our Indiana Supreme Court has made it quite clear that under this section of the Statute, I.C. 34–4–16.5–3(7), "[i]t does not follow, ... that the statute necessarily grants immunity for all acts of law enforcement officers committed while engaged in the enforcement of the law." *Seymour Nat'l Bank v. State* (1981), Ind., 422 N.E.2d 1223, *reh.* 428 N.E.2d 203, 204.

A "gut feeling" memorandum without any factual basis can hardly be within the scope of employment of a professional investigator. Too, it is not clear as to what rule or regulation was being enforced. It is doubtful that there is a rule or regulation against prisoners being happy when they visit and consult with their attorney. It is equally doubtful that there is any rule or regulation against a prisoner being "high-spirited" while consulting with his attorney. The immunity shield was never intended to protect baseless defamation or to protect those who attempt to interfere with the effective assistance of counsel.

Bad Faith was found by the trial court. This finding of fact is amply supported by the record. It can not be ignored on appeal. The Indiana Tort Claims Act merely encoded the common law tenets of sovereign immunity. See *Krueger v. Bailey* (1980), Ind.App., 406 N.E.2d 665; *Board of Commissioners of Delaware County v. Briggs* (1975), 167 Ind.App. 96, 337 N.E.2d 852. Prior to the Indiana Tort Claims Act and prior to *Campbell v. State* (1972), 259 Ind. 55, 284 N.E.2d 733,

> The common law immunity privilege was absolute for judges, legislators, and high ranking administrative officials regardless of their motives in acting so long as the act was within the jurisdiction of their official capacity. The privilege extended inferior agents and employees was conditioned on the nature of the agent's performance. Three considerations are foremost in a determination as to the applicability of this qualified privilege: (1) whether the agent's actions were undertaken in furtherance of a "discretionary" rather than "ministerial" function; (2) whether the action taken was within the scope of the agent's employment; and (3) whether the action was made in good faith (improper motives or a malicious purpose in exercising the discretion would, at common law, vitiate the immunity privilege).

*Sovereign Immunity in Indiana—Requiem?,* 6 Ind.L.Rev. 92, 104 (1972) (footnotes omitted).

Under common law, those governmental employees not in the highest positions of authority were afforded "qualified" or "conditional" immunity for acts committed in the performance of their duties which

resulted in loss or personal injury. *Sovereign Immunity in Indiana—Requiem?, supra; see generally Wallace v. Feehan* (1934), 206 Ind. 522, 190 N.E. 438.

No one could convincingly argue that a State employee has absolute immunity. Driving a State owned automobile blindfolded down a heavily traveled highway causing injuries and property damage to fellow travelers is an extreme example, but there are many more examples which exclude the shield of immunity. Defaming members of the legal profession without a factual basis or meaningful investigation is another example of bad faith where immunity should not attach. "Gut feelings" do not an investigation make and the trial court so found as the fact finder. The trial court found that the professional investigator acted in bad faith. Undeniably, the professional investigator was acting outside the scope of his employment. I would affirm the judgment of the trial court.