Jacqueline R. TITTLE, as Personal Representative of the Estate of Terry N. Tittle, Deceased, and on her own Behalf and Glen Alvin Cochran, by his next friend, Beth Ann Cochran, Appellants (Defendants Below),

v.

Michael MAHAN; David Meyers; David Gladieux; Glen Harpel; Oscar Equia; Daniel L. Figel, Sheriff of Allen County, Indiana; Rosemary Mosley; and the City of Fort Wayne. Appellees (Plaintiffs Below).

No. 57A03–9004–CV–132.

Court of Appeals of Indiana,
Third District.

Feb. 19, 1991.

John B. Powell, Shambaugh, Kast, Beck & Williams, Fort Wayne, for appellants.

Phillip A. Renz, Larry L. Barnard, Miller Carson & Boxberger, Fort Wayne, for appellees Rosemary Mosley & the City of Fort Wayne.

John O. Feighner, George Sistevaris, Haller & Covlin, Fort Wayne, for appellees Michael Mahan, David Meyers, David Gladieux, Glen Harpel, Oscar Equia & Daniel L. Figel, as Sheriff of Allen County.

STATON, Judge.

The appellants appeal the grant of a summary judgment for the appellees raising the following two issues for our determination:

I. Whether police and custodial authorities have immunity under Indiana Code 34–4–16.5–3(7) (Supplement 1990) for the failure to exercise reasonable care in communicating information concerning a pre-trial detainee's medical needs or in responding to such medical needs.

II. Whether the trial court committed an error of law in determining, as a matter of law, that the defendants did not violate Tittle's constitutional rights thus precluding recovery under 42 U.S.C. § 1983.

We affirm.

The facts viewed in the light most favorable to the appellants indicate that on April 14, 1987, Terry N. Tittle (Terry) was arrested and charged with criminal deviate conduct, robbery, and burglary. Upon being transported to the Detective Division of the Fort Wayne Police Department, he was interviewed by Detective Danny Jackson and Detective Rosemary Mosley. Terry was cooperative and described a drug and alcohol abuse problem. He appeared somewhat "spacy" and indicated that he had been recently released from the Richmond State Hospital for an alcohol and drug abuse problem but had been drinking beer and sniffing glue earlier in the day. He indicated that he was a little depressed that day because he had been turned down for unemployment benefits.

On April 15, 1987, Detective Mosley again interviewed Terry at the Allen County Lockup at his request. During the course of this interview, Terry stated that he felt very depressed, worse than the previous day. He also stated that some of the inmates told him that they had heard on the news that he had done some bad things. Terry indicated that if he had done those things he thought he should ask for the death penalty, because he did not want to live anymore. He noted that he was

probably facing sixty to ninety years for the charged crimes, and he would not be able to see his child which his girlfriend was expecting, a prospect through which he did not know if he could live. At the close of the interview, he stood up with his head bowed and stated that he could not bear the thought of doing the things for which he had been charged.

Apparently subsequent to this interview, Detective Mosley spoke to Terry's mother, Jacqueline Tittle, who informed her that Terry had previously attempted to commit suicide. This information was not communicated to the jail authorities.

Both the medical screening questionaire and the psychiatric referral form indicated that Terry was very nervous. The arrest report indicated that he had a scar on his left arm. A nurse's report stated that a liason (apparently from the Allen County Mental Health Association) indicated Terry did not appear suicidal, but appeared to be experiencing withdrawal. Terry was placed on withdrawal medication, incarcerated in a receiving cell and placed on periodical observation. On the observation form, "suicide precautions" was checked as the purpose of the observation, although Vicki Stonebraker, the Director of Medical Services, indicated that Terry was not placed on suicide precaution. Between three o'clock p.m. on April 16 and two o'clock p.m. on April 18, he was checked on forty-two times, at intervals between ten minutes and five and a half hours, most intervals being a little over an hour. Stonebraker testified that had Terry been placed on suicide precaution, the longest interval between observations would be one hour. There was no television camera in the receiving cell.

One hour and forty-eight minutes after he was last observed on April 18, Terry committed suicide by hanging himself from a bunk in the cell.

This action was filed by Jacqueline Tittle as administrator of Terry's estate and on her own behalf and Glen Alvin Cochran, Terry's son (collectively, "Tittle") on September 13, 1988, alleging negligence and violation of constitutional rights on the part of the City of Fort Wayne, Detective Mosley, the Allen County Sheriff, and certain deputies (collectively, "Officers"). Summary judgment was entered in favor of Officers and Tittle appeals.

In reviewing the grant or denial of a motion for summary judgment, the appellate court applies the same standard as the trial court. *Kopec v. Memorial Hospital of South Bend* (1990), Ind.App., 557 N.E.2d 1367, 1368, *transfer pending.* Summary judgment is proper only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Indiana Rules of Procedure, Trial Rule 56(C). All facts and inferences to be drawn therefrom are viewed in the light most favorable to the nonmoving party, and all doubts as to the existence of a material issue must be resolved against the movant. *Kopec, supra.*

## I.

### *Tort Claims Immunity*

Tittle contends that the trial court incorrectly determined that Officers were enforcing the law within the meaning of Indiana Code 34–4–16.5–3(7) when they committed the alleged acts of negligence. Indiana Code 34–4–16.5–3(7) provides:

Sec. 3. A governmental entity or an employee acting within the scope of his employment is not liable if a loss results from

\* \* \* \* \* \*

(7) the adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment.

The "enforcement of the law" provisions of the Tort Claims Act have been the subject of much litigation since the adoption of the Act in 1974. "Law enforcement" within the meaning of the Act has been interpreted to "involve[ ] a broad continuum of duties." *City of Gary v. Cox* (1987), Ind. App., 512 N.E.2d 452, *transfer denied.* Immunity has been granted from liability for a defamation claim resulting from the investigation of a crime, *Jacobs v. City of Columbus* (1983), Ind.App., 454 N.E.2d 1253, *transfer denied;* a claim in intention-

al tort for property damage arising out of the firing of tear gas canisters into a house by police in order to capture a fleeing murder suspect, *Indiana State Police v. May* (1984), Ind.App., 469 N.E.2d 1183, *rehearing denied;* a claim for negligence for the actions of a police officer allowing a prisoner whom she was guarding to escape, *Cox, supra;* actions for negligence arising from collisions when officers were traveling to the scene of a crime, *Carver v. Crawford* (1990), Ind.App., 564 N.E.2d 330, *Weber v. City of Fort Wayne* (1987), Ind.App., 511 N.E.2d 1074, *transfer denied, Crews v. Brockman* (1987), Ind.App., 510 N.E.2d 707, *transfer denied, Indiana State Police v. Swaggerty* (1987), Ind.App., 507 N.E.2d 649, *transfer denied;* an action for wrongful death arising out of a collision while the officer was engaged in a high speed chase involving speeds of up to 100 miles per hour, *Seymour National Bank v. State* (1981), Ind., 422 N.E.2d 1223, *modified,* 428 N.E.2d 203; a wrongful death action for an officer's negligence in leaving a malfunctioning traffic signal to respond to a report of domestic violence, *Board of County Com'rs v. Arick* (1985), Ind.App., 477 N.E.2d 112, *transfer denied;* claims of negligence in the setting out of flares and regulating traffic around an automobile accident, *Million v. Mullen* (1990), Ind.App., 554 N.E.2d 1137, *transfer denied, McFarlin v. State* (1988), Ind.App., 524 N.E.2d 807; an action for negligence in failing to provide adequate traffic control in a congested area, *State v. Flanigan* (1986), Ind. App., 489 N.E.2d 1216, *transfer denied;* and a negligence action against a sheriff and employees for the attempted suicide of a pre-trial detainee. *Sauders v. County of Steuben* (1991), Ind.App., 564 N.E.2d 948.[1]

under the care and control of the Fort Wayne Police Department when he committed suicide. Thus, if the City or Detective Mosley is to be liable, it must be for the failure of Detective Mosley to communicate the information which she gleaned from her interviews with Terry and his mother.

We do not find Detective Mosley's conduct to be distinguishable from the officers' conduct in the cases cited above. Tittle's action against Mosley and the City for failing to communicate information to prison authorities gained in the course of her investigation of a crime is similar to the cause of action for defamation which arose in the course of investigation of the crime in *Jacobs.* Both involved an act or omission in the course of performance of the police officer's duties. We do not find it significant that the officers in *Jacobs* were engaged in a pre-arrest investigation, rather than a post-arrest investigation like that conducted by Detective Mosley. In both cases, the officers sought to determine whether a law had been violated, a task clearly indispensible to the enforcement of the law. The only distinguishing factor is that Tittle alleges negligent rather than intentional conduct, a factor which does not save her cause of action against Mosley or the City. "If the injury in question resulted from the enforcement of a law, immunity is granted to both the governmental entity and to the employee, notwithstanding that the enforcement resulted in a loss that would not have occurred but for the negligent manner in which the duty was performed." *Seymour, supra,* 428 N.E.2d at 204. Here, as in *Jacobs,* the officer and the governmental entity are immune from liability.

## A.

### The Police

■ The uncontroverted facts indicate that Terry Tittle was not in the custody or

## B.

### The Sheriff and His Deputies

■ Tittle's complaint against the Allen County Sheriff and his deputies ("Depu-

1. *But see City of Wakarusa v. Holdeman* (1990), Ind.App., 560 N.E.2d 109, *transfer pending.* In *Holdeman,* the Court of Appeals affirmed the denial of a summary judgment, holding there was a question of fact existing as to whether the police officer's conduct in checking license plates in his rear view mirror and over his shoulder fell within the "outrageous conduct" exception delineated in *Seymour, supra,* 428 N.E.2d at 204. Here, Tittle does not allege that the conduct of the defendants was outrageous. The holding in *Holdeman* was criticized in *Carver, supra.*

**1068** 

ties") alleges negligence in the failure to properly care for Terry Tittle, the failure to properly communicate information material to his safekeeping, and the failure to prevent him from taking his life when they knew or should have known that he posed a risk to himself. Tittle argues that the Deputies, in maintaining custody of Terry Tittle, were not engaged in the enforcement of the law within the meaning of Indiana Code 34–4–16.5–3(7).

We addressed this precise issue in *Sauders v. The County of Steuben, supra.* In *Sauders*, the estate of a pre-trial detainee filed suit against the Steuben County Sheriff's Department and its employees after the detainee attempted suicide, alleging negligence in the defendants' care and supervision of the detainee. We held that the Indiana Tort Claims Act provides immunity from liability to a sheriff and his employees for alleged negligent acts committed at the county jail during the incarceration of a pre-trial detainee. *Id.,* at 949.

Tittle cites *Iglesias v. Wells* (1982), Ind. App., 441 N.E.2d 1017, in support of her contention that a cause of action survives. *Iglesias* is distinguishable in that it did not deal with the Tort Claims Act or governmental immunity.

Accordingly, we hold that the trial court properly dismissed Tittle's negligence claims against all defendants.

## II.

### *Federal Law: Section 1983*

██ Count One of Tittle's amended complaint alleges violation of Terry's constitutional rights by the Officers. Tittle asserts this claim pursuant to 42 U.S.C. § 1983, which provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Tittle's amended complaint contains the following allegations:

8. The death of TERRY N. TITTLE was caused by the following acts or omissions of the defendants:

a. failure to exercise reasonable care to preserve the life, health and safety of TERRY N. TITTLE while he was under the care, custody and control of the defendants;

b. the failure of the defendants to properly communicate among themselves such information which was material to the safekeeping of TERRY N. TITTLE while he was under the care, custody and control of the defendants; and

c. the failure of the defendants to exercise reasonable care to prevent TERRY N. TITTLE from attempting to take his own life when they knew, or in the exercise of reasonable diligence, should have known that he imposed a serious risk to himself.

9. The aforementioned acts or omissions of the defendants constituted deliberate indifference or reckless disregard to the need for reasonable medical care of the decedent, TERRY N. TITTLE.

Amended Complaint, Record, p. 20.

██ In a suit under § 1983, the plaintiff must prove a violation of some right guaranteed by the federal constitution. *Daniels v. Williams* (1986), 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662. Depending upon the right, merely negligent conduct may not be enough to state a claim. *Id.* Here, Tittle alleges violation of Terry's Fifth Amendment right to due process of law, his Eighth Amendment right to be free of cruel and unusual punishment, and his Fourteenth Amendment right to due process of law. Appellant's Brief at 20.

██ The Fifth Amendment Due Process Clause by its language applies to the federal government, which is not a party to this suit. Eighth Amendment scrutiny is appropriate only after criminal prosecution;

it does not apply to pre-trial detainees. *City of Revere v. Massachusetts General Hosp.* (1983), 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605. However, pre-trial detainees possess due process rights under the Fourteenth Amendment which are at least as great as the Eighth Amendment protections enjoyed by a convicted prisoner. *Id.* Thus, Tittle's action must stand or fall according to the validity of his Fourteenth Amendment Due Process claims.

It is well settled that "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels, supra,* 106 S.Ct. at 663 (emphasis in original); *Davidson v. Cannon* (1986), 474 U.S. 344, 348, 106 S.Ct. 668, 671, 88 L.Ed.2d 677. The precise standard of care constitutionally required in the case of a pre-trial detainee, however, is somewhat less clear. Courts have sometimes borrowed the Eighth Amendment's two-prong standard enunciated in *Estelle v. Gamble* (1976), 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251, *rehearing denied,* requiring the pretrial detainee to show 1) a serious medical need; and 2) deliberate indifference to that need on the part of prison officials. *See e.g. Popham v. City of Talladega* (11th Cir.1990), 908 F.2d 1561, 1563; *Partridge v. Two Unknown Police Officers of Houston* (5th Cir.1986), 791 F.2d 1182, 1187; *Inmates of Allegheny County Jail v. Pierce* (3rd Cir.1979), 612 F.2d 754, 762.[2] The standard has also been stated to require the detainee to show that the governmental entity or official has acted with "reckless disregard" or "reckless indifference" toward the detainee or that the entity or official was "grossly negligent" in some way. *See e.g. Colburn v. Upper Darby Township* (3rd Cir.1988), 838 F.2d 663, 669–670, *cert. den.* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808.

■ Regardless of how the standard has been worded, it is clear that mere conclusory allegations of "deliberate indifference" or "reckless disregard" will not ward off an attack on the validity of a § 1983 claim. *Freedman v. City of Allentown, PA.* (3rd Cir.1988), 853 F.2d 1111, 1115. Rather, "[t]he court must determine from the factual scenario pled whether the plaintiff could make out a constitutional claim rather than one for mere negligence by the custodian which might be redressed, if at all, under state law." *Id.* Since this case comes to us upon the grant of summary judgment, we are able to "pierce the pleadings" to determine the sufficiency of the plaintiff's allegations. *Hirschauer v. C & E Shoe Jobbers, Inc.* (1982), Ind.App., 436 N.E.2d 107, 110.

The federal courts have recognized the difficulties attendant to the imposition of § 1983 liability for injuries caused by persons other than the defendant officials, particularly where the injury is caused by the individual's own self-destructive behavior. *Colburn, supra,* at 667. The courts have refused to require prison custodians to be guarantors of the prisoner's safety, and have emphasized that reckless disregard of the obligation to take precautions to protect the safety of the prisoner may not be inferred from the act of suicide itself. *Freedman, supra,* at 1115. Nevertheless, they have recognized three factual scenarios which would support a § 1983 action in the case of a prison suicide: 1) where the individual officers themselves have taken some sort of affirmative action directly leading to the prisoner's suicide; 2) where it is demonstrated that the prison official actually knew of the suicidal tendencies of the prisoner, but failed to take reasonable precautions to prevent the suicide; and 3) where the governmental entity or officials under the circumstances should have known that the prisoner was a

---

**2.** The "deliberate indifference" standard has won the day in at least one context in § 1983 actions. In *City of Canton, Ohio v. Harris* (1989), 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, the Supreme Court held that § 1983 liability will attach "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate' indifference to the rights of its inhabitants." *Id.* 109 S.Ct. at 1205. See our discussion of the City's liability, Section II(A) *infra.*

suicide risk, yet failed to take reasonable precautions for his safety.[3] *Id.*

### A.
### *The Police*

■ Tittle's § 1983 claim against Officer Mosley is based upon the allegation that she was aware of Tittle's suicidal tendencies, yet failed to communicate the problem to the officials at the county jail. Similar claims were rejected in *Freedman, supra,* and *Davidson, supra.* In *Davidson,* the Supreme Court found that the failure of prison officials to take action after being informed of menacing overtures toward the plaintiff by another prisoner constituted mere negligence, rather than the type of abuse of governmental power proscribed by the Due Process Clause. *Id.* 474 U.S. at 347–348, 106 S.Ct. at 670.

Citing *Davidson,* the Third Circuit in *Freedman* held that a probation officer's failure to inform jail officers that Freedman had attempted suicide on a previous occasion was merely negligent, and affirmed the district court's dismissal of the claim against the probation officer. *Id.* at 1117. There is nothing in this case to distinguish Mosley's actions (or inactions) from those of the probation officer in *Freedman.* Accordingly, we affirm the trial court's entry of summary judgment as to Officer Mosley.

■ Tittle's § 1983 claim against the City of Fort Wayne is based upon its failure to adequately train its officers or to implement policies which would effectively guard against jail suicides.[4] Appellant's brief at 25–26.

In *City of Canton v. Harris, supra* note 2, the Supreme Court held that "the inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* 474 U.S.

at 388, 109 S.Ct. at 1204. Tittle bases her claim on the absence of a standard operating procedure or protocol to be followed by the Fort Wayne Police Department when a suspect or arrestee displays suicidal tendencies, the absence of a written policy or procedure manual on suicide prevention, and non-existent or inadequate training as a result of the lack of policies, procedures, or protocol with respect to arrestee suicides.

Although Officer Mosely did testify in her deposition that there was no specific procedure to be followed in reporting conduct to the deputies in charge of the lockup, she also indicated that it was the custom of officers on the department to report abnormal behavior or known suicidal tendencies to the authorities at the lockup. She indicated that she relied on her fifteen years of experience on the police force when determining what kind of information would be relevant to the deputies indicating that an arrestee was suicidal. She also stated that she encountered nothing in her interview with Terry that would indicate to her that he was suicidal. We cannot find that the failure of the police department to enact specific guidelines constituted deliberate indifference or evidenced inadequate training. Officer Mosely was operating within the general guideline that if she observed anything unusual about the arrestee's behavior, she should pass that information on to the deputies. She was able to give examples of behavior which she would consider indicative of suicidal tendencies. The Director of Medical Services at the jail indicated that information regarding suicidal tendencies had been communicated to jail officials by Fort Wayne Police officers on previous occasions. Finally, we do not find it relevant that the guidelines were not written.

■ With respect to Officer Mosely's failure to relate the contents of her subse-

---

**3.** We include in this third category those cases where the governmental entity has demonstrated a deliberate indifference to the need for proper training of officers or prison officials with regard to suicide prevention. *See City of Canton, supra* note 2.

**4.** Tittle could not base a § 1983 claim against the municipality on the doctrine of *respondeat superior. City of Canton, supra* note 2, at 1203.

quent conversation with Terry's mother about his prior suicide attempt, we find the following language from *City of Canton* to be relevant to our inquiry:

> In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officer must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. [Citations omitted.] It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Id.* at 390–91, 109 S.Ct. at 1205–1206.

In sum, we find no evidence of a deliberate indifference on the part of the city toward arrestees with suicidal tendencies, nor do we find even a shred of evidence of a city policy not to prevent jail suicide. The trial court properly granted summary judgment for the city dismissing Tittle's § 1983 claim.

### B.

#### Sheriff and Deputies

In support of his § 1983 claim against the sheriff and deputies, Tittle alleges:

1) Terry was not placed on suicide precaution, as his records require, but was placed in isolation.

2) No effort was made to contact Terry's family to ascertain his prior suicide history.

3) Terry was undergoing withdrawal from drugs and alcohol, which increased the risk that he might become suicidal.

4) Though Terry was placed under observation, the observations of him were "sporadic at best".

Appellant's Brief at 25.

These allegations do not support a § 1983 action against the deputies and the sheriff. It is undisputed that the jail officials were unaware of Tittle's prior suicide attempt. Cases have consistently held that failure to prevent suicide does not constitute deliberate indifference where the authorities had no knowledge of the detainee's suicidal tendencies. *Popham, supra,* at 1564. Generally, the courts have reached this conclusion because, as here, the plaintiff has been unable to allege conduct that was more than merely negligent. Here, although "suicide precaution" was checked on Terry's observation order, he was not monitored as frequently as that situation would require.[5] Although the failure to monitor Terry frequently enough might show somewhat less than strict compliance with the guidelines, it cannot be characterized as anything more than negligent. Similarly, the failure to follow up on Terry's psychological history was, at most, negligent. The record indicates that individuals suffering from alcohol and drug withdrawal are potential suicide risks, but the record also indicates that the jail officials' concerns about Terry's alcohol and drug problems motivated them to place him in isolation, give him medication, and place him under periodic observation. In sum,

5. Vicki Stonebraker, the Director of Medical Services at the jail, testified that if an inmate is placed on suicide precaution, the longest interval between observations would be one hour. Terry's observation order indicates that of the 42 intervals indicated between observations from three o'clock April 16 to two o'clock April 18, two were less than a half hour in duration, ten were from a half-hour to an hour, eighteen were an hour, and twelve were over an hour. Of the twelve intervals that were over an hour, nine were ninety-five minutes or less. Record, pp. 167–168.

far from showing deliberate indifference, the record indicates that the deputies followed their procedure for observing those with psychological or substance abuse problems, in order to protect Terry and the other prisoners. Given their lack of knowledge of Terry's psychological profile, we cannot say that their choice of procedures exhibited a deliberate indifference toward Terry. Although some of their actions or inactions might be characterized as negligent, it is well settled that negligence alone will not support Tittle's § 1983 claim. *Daniels, supra.* The trial court properly dismissed Tittle's § 1983 claim against the Sheriff and deputies.

*Affirmed.*

MILLER, P.J., and GARRARD, J., concur.